**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DARRELL J. ROBINSON**, Individually, and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> -against-<br><br>**RAYTHEON TECHNICAL SERVICES COMPANY L.L.C.** and **RAYTHEON COMPANY**,<br><br>     Defendants. | Civil Action No. 1:13-cv-12705 |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT RAYTHEON TECHNICAL SERVICES COMPANY L.L.C. AND
RAYTHEON COMPANY'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

James P. Gillespie, P.C. (*pro hac vice pending*)
Daniel A. Bress (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Suite 1200
Washington, D.C. 20005
Tel.: (202) 879-5000
jgillespie@kirkland.com
dbress@kirkland.com

James F. Kavanaugh, Jr.
Christopher K. Sweeney
CONN, KAVANAUGH, ROSENTHAL,
PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA 02109
Tel: (617) 482-8200
jkavanaugh@connkavanaugh.com
csweeney@connkavanaugh.com

*Counsel for Raytheon Company and Raytheon Technical Services Company LLC*

# TABLE OF CONTENTS

**Page**

**BACKGROUND** ...................................................................................................................2

    A.    Mr. Robinson's Employment In Kuwait...................................................................2

    B.    The Putative Class Action Lawsuit........................................................................4

**ARGUMENT** .......................................................................................................................5

I.     COUNTS 1 AND 3 MUST BE DISMISSED BECAUSE MR. ROBINSON'S MOU DOES NOT INCORPORATE KUWAITI LAW........................................................6

II.    COUNTS 2 AND 4 MUST BE DISMISSED BECAUSE THE COMPLAINT FAILS TO STATE A CLAIM UNDER KUWAITI LABOR LAW..................................9

    A.    Mr. Robinson Has Failed To Exhaust His Administrative Remedies, A Substantive Component Of Kuwaiti Law That U.S. Courts Must Enforce...........10

    B.    Even If The Claims Under Kuwaiti Law Could Proceed In Federal Court, Abstention Would Be Appropriate Here...............................................................16

**CONCLUSION** .................................................................................................................19

# TABLE OF AUTHORITIES

Page(s)

## <u>CASES</u>

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 5

*Bean v. Bank of N.Y. Mellon*,
  2012 WL 4103913 (D. Mass. Sept. 18, 2012)..................................................... 6, 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 554 (2007) ................................................................................................. 5

*Biegacz v. Nutchey*,
  1989 WL 134781 (N.D. Ill. Oct. 13, 1989) ........................................................... 12

*Bigio v. Coca-Cola Co.*,
  239 F.3d 440 (2d Cir. 2000) .............................................................................. 16, 17

*Brooks v. AIG SunAmerica Life Assur. Co.*,
  480 F.3d 579 (1st Cir. 2007) .................................................................................. 6

*Clarke v. Kentucky Fried Chicken of Cal., Inc.*,
  57 F.3d 21 (1st Cir. 1995) ..................................................................................... 12

*Day & Zimmerman, Inc. v. Challoner*,
  423 U.S. 3 (1975) ................................................................................................... 13

*Diorinou v. Mezitis*,
  237 F.3d 133 (2d Cir. 2001) .................................................................................. 18

*Doyle v. Hasbro, Inc.*,
  103 F.3d 186 (1st Cir. 1996) ............................................................................... 6, 8

*Erie R. Co. v. Tompkins*,
  304 U.S. 64 (1938) .......................................................................................... passim

*Feinstein v. Mass. Gen'l Hosp.*,
  643 F.2d 880 (1st Cir. 1981) ........................................................................... 12, 15

*Foregger v. Residential Credit Solutions, Inc.*,
  2013 WL 3208596 (D. Mass. June 21, 2013) ......................................................... 7

*GDG Acquisitions LLC v. Government of Belize*,
  935 F. Supp. 2d 1348 (S.D. Fla. 2013)................................................................... 17

*Hanna v. Plumer*,
  380 U.S. 460 (1965) ............................................................................................... 13

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008)....................................................... 18

*In re JPMorgan Chase Mortg. Modification Litig.*,
   880 F. Supp. 2d 220 (D. Mass. 2012) ................................................................................... 2

*Jones v. Deaconess Billings Clinic*,
   2008 WL 5435956 (D. Mont. July 14, 2008) ...................................................................... 12

*Kasper Global Collection & Brokers, Inc. v. Global Cabinets & Furniture Mfrs. Inc.*,
   2013 WL 3388427 (S.D.N.Y. July 1, 2013) ....................................................................... 11

*Kiluk v. Select Portfolio Servicing, Inc.*,
   2011 WL 8844639 (D. Mass. Dec. 19, 2011) ................................................................. 6, 10

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941) ............................................................................................................ 11

*Lockhart v. Coastal Int'l Sec., Inc.*,
   905 F. Supp. 2d 105 (D.D.C. 2012) .............................................................................. 12, 16

*Lowney v. Genrad, Inc.*,
   925 F. Supp. 40 (D. Mass. 1995) .......................................................................................... 8

*Maersk, Inc. v. Neewra, Inc.*,
   554 F. Supp. 2d 424 (S.D.N.Y. 2008) ................................................................................ 19

*Martin v. D-Wave Systems Inc.*,
   2010 WL 724708 (N.D. Cal. Feb. 26, 2010) ....................................................................... 15

*Northrop Grumman Info. Tech., Inc. v. United States*,
   535 F.3d 1339 (Fed. Cir. 2008) ............................................................................................. 8

*Ohkubo v. Antara Biosciences, Inc.*,
   364 F. App'x 340 (9th Cir. 2010) ....................................................................................... 10

*Quiroga v. Fall River Music, Inc.*,
   1998 WL 851574 (S.D.N.Y. Dec. 7, 1998) ......................................................................... 11

*Sandhill Motors, Inc. v. Am. Motors Sales Corp.*,
   667 F.2d 1112 (4th Cir. 1981) ............................................................................................ 12

*Soto-Torres v. Fraticelli*,
   654 F.3d 153 (1st Cir. 2011) ................................................................................................. 5

*St. Christopher Assocs., L.P. v. United States*,
   511 F.3d 1376 (Fed. Cir. 2008) ............................................................................................. 9

*Stoner v. Presbyterian Univ. Hosp.*,
   609 F.2d 109 (3d Cir. 1979) .......................................................................................... 12, 13

*Svenska Ortmedicinska Institutet, AB v. DeSoto*,
   164 F. Supp. 2d 27 (D. Me. 2001) ........................................................................................ 7

*Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*,
   524 F.3d 315 (1st Cir. 2008) ........................................................................................... 6, 10

*Turner Entm't Co. v. Degeto Film GmbH*,
    25 F.3d 1512 (11th Cir. 1994) ................................................................ 16

*Ungaro-Benages v. Dresdner Bank AG*,
    379 F.3d 1227 (11th Cir. 2004) ................................................ 16, 18, 19

*United States v. Nippon Paper Indus. Co, Ltd.*,
    109 F.3d 1 (1st Cir. 1997) .......................................................................... 17

*White v. Lavigne*,
    741 F.2d 229 (8th Cir. 1984) ................................................ 12, 13, 14

## STATUTES AND REGULATIONS

28 U.S.C. § 2254(b)(1)(A) ............................................................................. 14

29 U.S.C. § 626(d)(1) ...................................................................................... 14

42 U.S.C. § 2000e-5(f) ..................................................................................... 14

8 U.S.C. § 1252(d)(1) ...................................................................................... 14

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 5

Fed. R. Civ. P. 23(b)(3) ..................................................................................... 5

## OTHER AUTHORITIES

Practice Guide: Federal Civil Procedure Before Trial § 1:253
    (William W. Schwarzer *et al.*, eds. 2013) ............................................ 12

In this novel lawsuit, Plaintiff Darrell J. Robinson, an American who formerly worked for Raytheon on a U.S. military base in Kuwait, brings a putative class action alleging violations of Kuwaiti labor laws, such as overtime pay during Ramadan and Kuwaiti holidays. Plaintiff's claims fail as a matter of law for a number of reasons.

*First*, as explained in Part I below, Counts 1 and 3 of the complaint fail to state breach-of-contract claims because the agreement at issue does not incorporate Kuwaiti labor law, either explicitly or by implication. Mr. Robinson has not identified any contractual provision that entitles him to the benefits he seeks, and this alone requires dismissal. An examination of the Memorandum of Understanding (MOU) regarding Mr. Robinson's employment attached to the complaint only confirms that Mr. Robinson cannot plead a plausible theory of breach. That MOU simply does not require compliance with Kuwaiti labor law—and certainly not with the clarity required to incorporate by reference the laws of a foreign country on a wholesale basis. Mr. Robinson's MOU provided him with substantial compensation for his work overseas, and he has not alleged that Raytheon has not paid him all of the compensation that his MOU promised.

*Second*, as explained in Part II.A below, Counts 2 and 4 of the complaint fail to state a claim for a direct violation of Kuwaiti labor law. As the translated copy of Kuwaiti law attached to Mr. Robinson's complaint demonstrates, the Kuwaiti statute at issue requires employees to exhaust administrative remedies in one of Kuwait's "Labour Departments" before turning to the courts for relief. As is well-established in the *Erie* context for federal court application of *state* law, an administrative exhaustion requirement in *foreign* law is a substantive feature of foreign law that federal courts must enforce when a plaintiff alleges that foreign law applies. That prevents forum-shopping and the inequitable administration of the law—objectives that, if anything, are all the more compelling in the context of alleged violations of foreign law, given

the importance of respecting other sovereign nations' administration and enforcement of their own laws. In this case, even assuming for purposes of this motion that Kuwaiti law could apply here, Mr. Robinson has not alleged that he has exhausted his administrative remedies in Kuwait, and thus he fails to state a claim for violation of Kuwaiti labor law.

**Finally**, as explained in Part II.B below, if the Court does not dismiss this case on the merits, it should exercise its discretion and abstain based on principles of international comity. This case concerns work performed in Kuwait and purportedly subject to Kuwaiti law. Kuwait thus has the strongest interest in adjudicating it, not to mention a greater familiarity with its own labor code and the Arabic language. There is no suggestion that the Kuwaiti legal system presents an inadequate forum for dispute resolution; what is more, it is not even clear that claims for violation of the Kuwaiti labor laws can be brought in courts outside of Kuwait. Under these circumstances, it is at best premature for a federal court to wade into a case involving the alleged application of Kuwaiti labor law to American contractors supporting U.S. military operations in the Middle East—a matter fraught with potential foreign policy significance—before the Kuwaiti judicial system has even been given an opportunity to consider it.

In sum, the complaint suffers from multiple defects that compel dismissal.

## BACKGROUND[1]

### A.    Mr. Robinson's Employment In Kuwait.

Defendant Raytheon Company is an American corporation and the parent company of defendant Raytheon Technical Services Company LLC (collectively, "Raytheon"). *See* Compl. ¶¶ 6, 7. In May 2008, plaintiff Darrell J. Robinson, a resident of Columbus, Georgia,

---

[1] Since this motion arises at the Rule 12(b)(6) stage, the plausible allegations in the complaint are assumed to be true for present purposes only. *See, e.g.*, *In re JPMorgan Chase Mortg. Modification Litig.*, 880 F. Supp. 2d 220, 225 n.2 (D. Mass. 2012).

began work as an analyst for Raytheon at Camp Buehring in Kuwait. *See id.* ¶¶ 6, 18; *see also id.* Ex. A at 1 ("Your work location will be in Camp Buehring, Kuwait."). Camp Buehring is located near the border of Iraq and has been used to support U.S. military operations there. Mr. Robinson worked for Raytheon in Kuwait until 2013. *Id.* ¶ 6.

Mr. Robinson has attached to his complaint a May 2011 offer letter and incorporated Memorandum of Understanding (MOU) concerning his employment with Raytheon, which form the basis for his claims here. *See* Compl. Ex. A (Offer Letter); *id.* Ex. B (MOU). The MOU flatly states that it "is not intended to create a contract of employment," and that Mr. Robinson's employment would be as an "'at will'" employee. *Id.* Ex. B at 1. The MOU further provides that "[t]his MOU and your offer letter constitute your entire agreement with the Company regarding your employment," and that "[t]his Agreement may only be amended or modified in writing." *Id.*

The MOU and offer letter contain various terms and conditions of Mr. Robinson's employment. As is often common in agreements such as this—involving Americans who support the demands of active military operations abroad—Mr. Robinson agreed to be on call "seventy-two (72) hours per week, seven (7) days per week." Compl. Ex. B at 3; *see also id.* ¶ 20 & Ex. A at 1. In exchange, Mr. Robinson received a substantial compensation package. He was provided more than $185,000 in base annual compensation. *Id.* Ex. A at 1. He additionally received a "hardship premium" "in view of the difficult conditions, lack of amenities and/or excessive physical hardships you may encounter," as well as a cost-of-living allowance, home-leave allowance, lodging, and transportation. *Id.* Ex. B at 5-6. He also continued to be eligible for various other benefits, including company-paid insurance plans and air travel at the end of his term. *Id.* Ex. B at 6-9. There is no allegation here that Raytheon did not pay Mr. Robinson all of

the various forms of compensation set forth in his MOU.[2]  Significantly, neither the offer letter

nor the MOU calls for the application of Kuwaiti labor law.

### B.      The Putative Class Action Lawsuit.

Mr. Robinson ceased working for Raytheon in June 2013 and filed this putative class

action lawsuit in October 2013.  Compl. ¶ 6.  This lawsuit has been filed in federal court in

Massachusetts based on a forum selection clause in Mr. Robinson's MOU.  *See id.* ¶¶ 4, 15; *see*

*also id.* Ex. B at 10 ("The courts within the Commonwealth of Massachusetts in the United

States, whether state or federal, shall have exclusive jurisdiction over disputes concerning this

Agreement," and "[a]ny legal action which is in any way connected with this Agreement or your

employment by the Company must be instituted in such courts.").

The stated basis for this lawsuit is that Raytheon "agreed and consented to obey Kuwaiti

law in regard to [its] employment of Plaintiff and similarly situated employees," and that

"[a]lternatively, Plaintiff and similarly situated employees … are entitled to relief via

Massachusetts Choice of Laws applying the labor laws of the foreign state," *i.e.*, Kuwait.

Compl.  ¶¶ 3, 22.  Mr. Robinson contends that Raytheon did not adhere to Kuwaiti labor law in a

variety of ways, including provisions governing overtime pay, *id.* ¶ 27-30, reduced hours during

the month of Ramadan, *id.* ¶ 31, paid days off for official Kuwaiti holidays, *id.* ¶ 34, an "end of

service" payment, *id.* ¶ 39, and 30-days annual leave per year, *id.* ¶ 42.

The complaint asserts four counts based on this same underlying conduct.  In Count 1,

Mr. Robinson alleges that Raytheon "breached [its] contract with Plaintiff and similarly situated

---

[2] Though not controlling the legal issues presented here, by Raytheon's determination and
between 2010 and 2012—the last three full years of Mr. Robinson's employment with
Raytheon—Mr. Robinson received annual compensation ranging from approximately $175,000
to nearly $220,000.  These amounts do not include the value of the various non-monetary
benefits (such as health insurance) that Mr. Robinson also received.

employees by refusing to obey Kuwaiti [labor] law." *Id.* ¶ 58. Count 2 alleges that Raytheon "violated the employment laws of the country of Kuwait" by failing to provide compensation in accordance with Kuwaiti law. *Id.* ¶ 63. Counts 3 and 4 track Counts 1 and 2, respectively, except that they are brought as "individual claims" rather than on behalf of a class. *See id.* ¶¶ 65-68 ("Individual Claim for Breach of Contract"), ¶¶ 69-73 ("Individual Claim for Violation of Kuwaiti Law"). With respect to Counts 1 and 2, the putative class is defined as "[a]ll current and former employees of Defendants, who worked in Kuwait from May 2008 until July 2013," and who did not receive compensation or other benefits in accordance with Kuwaiti law. *Id.* ¶ 46. Because the class primarily seeks monetary relief, class certification is sought only under the more demanding standards in Federal Rule of Civil Procedure 23(b)(3). *Id.* ¶ 47.

## ARGUMENT

To survive dismissal, a complaint must "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The plaintiff has the burden of alleging "enough facts" to establish a plausible theory of relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). Accordingly, courts do "not accept the complaint's legal conclusions or naked assertions devoid of further factual enhancement." *Soto-Torres v. Fraticelli*, 654 F.3d 153, 156 (1st Cir. 2011) (quotations omitted). Dismissal is appropriate if the complaint fails to allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Applying these standards, the claims here should be dismissed. *First*, the complaint fails to state a claim for breach of contract. Mr. Robinson has not pointed to any provision in his contract that guarantees the benefits he now claims, and the agreement attached to his complaint does not in any event incorporate Kuwaiti law. *Second*, the complaint fails to state a claim for a direct violation of Kuwaiti law. Mr. Robinson cannot seek relief in federal court without

exhausting the remedies set out in Kuwaiti law itself.  *Third*, and at a minimum, in light of the international comity and foreign policy dimensions of this case, this Court should abstain from exercising jurisdiction over claims concerning work performed in Kuwait that are allegedly governed by Kuwait law.  That is especially so when it is unclear whether these Kuwaiti statutory claims can be brought in courts outside of Kuwait, and where there is no allegation that the Kuwaiti legal system is inadequate.

## I.      COUNTS 1 AND 3 MUST BE DISMISSED BECAUSE MR. ROBINSON'S MOU DOES NOT INCORPORATE KUWAITI LAW.

Mr. Robinson's attempt to convert alleged violations of Kuwaiti labor law into a claim for breach of contract is foreclosed as a matter of law, for two separate and independent reasons.[3]

*First*, the complaint fails to satisfy the fundamental pleading requirement of identifying a particular contractual provision that Raytheon purportedly violated.  A plaintiff "must do more than allege, in conclusory fashion, that the defendant breached the contract," and instead must "describ[e], 'with substantial certainty,' the specific contractual promise the defendant failed to keep."  *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007); *see also Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (affirming dismissal because, *inter alia*, "[c]onclusory statements that '[defendant] and its executives failed to meet their contractual requirement,' ... are insufficient to satisfy the pleading requirements"); *Bean v. Bank of N.Y. Mellon*, 2012 WL 4103913, at *9 (D. Mass. Sept. 18, 2012) (granting dismissal because, *inter*

---

[3] Since Mr. Robinson's MOU and May 2011 offer letter are attached to his complaint, they may be considered in ruling on a motion to dismiss.  *See, e.g., Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) ("Under Rule 12(b)(6), the district court may properly consider only facts and documents that are part of or incorporated into the complaint."); *Kiluk v. Select Portfolio Servicing, Inc.*, 2011 WL 8844639, at *3 (D. Mass. Dec. 19, 2011) ("Material[s] attached to a complaint, or incorporated by reference, are a part of the pleading itself, and the Court may consider them on a motion to dismiss.").

*alia*, plaintiff "does not describe with substantial certainty the specific contractual promise that [defendant] failed to keep").

Here, and rather than pointing to any specific clause of his employment agreement, Mr. Robinson vaguely alleges, based on "information and belief," that "Defendants agreed and consented to obey Kuwaiti law in regard to their employment of Plaintiff and similarly situated employees." Compl. ¶ 22; *see also id.* ¶ 58 ("Defendants breached their contract with Plaintiff and similarly situated employees by refusing to obey Kuwaiti law."); *id.* ¶ 66 ("Upon information and belief, Defendants contractually agreed to pay Plaintiff according to Kuwaiti law."). These are precisely the sorts of conclusory allegations that courts in the First Circuit have held to be insufficient as a matter of law. *See, e.g.*, *Foregger v. Residential Credit Solutions, Inc.*, 2013 WL 3208596, at *5 (D. Mass. June 21, 2013) ("The proposed amended complaint does not describe with specificity any contractual promises that plaintiff alleges defendant did not keep. Instead, plaintiff's allegations appear to be premised entirely on alleged violations of Massachusetts law."); *Svenska Ortmedicinska Institutet, AB v. DeSoto*, 164 F. Supp. 2d 27, 31 (D. Me. 2001) ("[T]hey fail to point to the breach of any specific contractual provision. The Court will not speculate about which of the contractual provisions in the four agreements Plaintiff alleges have been breached.").

The problem is, if anything, even more severe for the time period prior to May 2011. The only contractual-type documents attached to Mr. Robinson's complaint are a May 2011 offer letter and related MOU. *See* Compl. Exs. A & B. But the MOU specifically states that "[t]his MOU and your offer letter … supersede all … prior oral or written promises, understandings, and agreements regarding your employment." *Id.* Ex. B at 1. For the period prior to May 2011, therefore, Mr. Robinson has failed to identify any *contract at all* that Raytheon purportedly

breached. It is axiomatic that such a failure by definition requires dismissal of a breach-of-contract claim. *See, e.g.*, *Doyle v. Hasbro, Inc.*, 103 F.3d at 194 (affirming dismissal because, *inter alia*, "[t]he amended complaint fails to state the nature of the alleged contract with any specificity. There is no presentation of the terms of a contract, its duration, or even when it was formed."); *Bean*, 2012 WL 4103913, at *9 (granting dismissal because, *inter alia*, plaintiff's "claim merely relates vague generalities about a breach of an unspecified contract").

*Second*, the breach-of-contract claims fail for the independent reason that Mr. Robinson's employment agreement does not generally incorporate Kuwaiti law, much less the particular labor law provisions identified in the complaint. In order for another document to be incorporated into a contract by reference, the incorporation must be clear and apparent: "[I]t is well established that incorporation by reference requires that the document to be incorporated be referred to and described in the contract so that the referenced document may be identified beyond doubt." *Lowney v. Genrad, Inc.*, 925 F. Supp. 40, 47 (D. Mass. 1995) (quotations omitted); *see also Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008) (requiring "language that is *express* and *clear*, so as to leave no . . . reasonable doubt about the fact that the referenced document is being incorporated into the contract") (emphasis in original).

This clear-statement rule has particular application when a party claims that a contract silently incorporated an entire body of law. As the Federal Circuit has explained, courts should be rightly wary of such assertions, because the "wholesale incorporation of regulations into a contract would allow [a] contracting party to choose among a multitude of regulations as to which he could claim a contract breach—and thus a wholly new ground of obligation would be summarily created by mere implication." *St. Christopher Assocs., L.P. v. United States*, 511

F.3d 1376, 1384 (Fed. Cir. 2008). For this reason, courts are "reluctant to find that statutory or regulatory provisions are incorporated into a contract . . . unless the contract *explicitly* provides for their incorporation." *Id.* (emphasis added). That principle has, if anything, even greater force where a party claims that a contract silently incorporated *foreign* law, which can reflect legal rules (and indeed a foreign language—here Arabic) that are simply less familiar to the contracting parties.

Under these well-established standards, the documents attached to the complaint fall well short of incorporating Kuwaiti labor law. Nothing in those documents calls for Mr. Robinson to be compensated in accordance with Kuwaiti law. The only reference to foreign law is the instruction that *Mr. Robinson* "observe local working hours and public holidays." Compl. Ex. B at 3. But it is not plausible that this half sentence, directed at Mr. Robinson's own conduct, contractually obligated Raytheon to provide the salary, overtime, benefits, and severance pay purportedly required under Kuwaiti law, much less in a clear or express manner. In fact, the MOU instead specifically sets forth Mr. Robinson's work hours, a particular salary, and a defined set of benefits, noting that he will be on the "US payroll." *Id.* at 3-8.

Accordingly, the breach of contract claims in Counts 1 and 3 should be dismissed.[4]

## II. COUNTS 2 AND 4 MUST BE DISMISSED BECAUSE THE COMPLAINT FAILS TO STATE A CLAIM UNDER KUWAITI LABOR LAW.

To the extent that Counts 2 and 4 alleging violations of Kuwait law are ultimately based on an alleged breach of contract, those Counts fail for the reasons stated above. But to the extent

---

[4] Over the course of Mr. Robinson's assignment, the parties modified his MOU several times. While a subsequent agreement explicitly referenced Kuwaiti law, Mr. Robinson has not claimed a violation of any agreement other than the one he attached to his complaint. Rather, the premise of his class allegations is that other Raytheon employees "had similar agreements and MOUs," Compl. ¶ 26, referring only to the MOU attached to the complaint.

Mr. Robinson alleges a direct violation of Kuwaiti law independent of his MOU, such a claim also fails. Even assuming for purposes of this motion that Kuwaiti law could apply here, Mr. Robinson's claim is deficient because he does not and could not allege that he exhausted his Kuwaiti administrative remedies, as Kuwaiti law requires. But even if Mr. Robinson could bypass that administrative process by filing this lawsuit outside Kuwait, this Court, based on principles of international comity, should still abstain from exercising jurisdiction under the particular circumstances of this case.

### A. Mr. Robinson Has Failed To Exhaust His Administrative Remedies, A Substantive Component Of Kuwaiti Law That U.S. Courts Must Enforce.

Although he asserts that Raytheon violated several provisions of Kuwait labor law, Mr. Robinson has not alleged he complied with that law's explicit administrative exhaustion requirements. According to the translation of Kuwaiti law that Mr. Robinson has attached to his complaint as Exhibit C, Kuwaiti law requires plaintiffs to first file their complaints with a Kuwaiti administrative agency, which then conducts mediation and, if that is unsuccessful, prepares a memorandum for the assigned trial court.[5] Specifically, Article 146 of the law provides as follows:

---

[5] Since Mr. Robinson attached this translation to the complaint, the Court may properly consider it here. *See, e.g.*, *Trans-Spec Truck Serv.*, 524 F.3d at 321; *Kiluk*, 2011 WL 8844639, at *3; *see also* Compl. ¶ 25 (representing that Exhibit C is "a translation" of Kuwaiti labor law). Notably, having attached such a translation to his complaint and necessarily representing its accuracy, Mr. Robinson is *bound* by that translation. *See Ohkubo v. Antara Biosciences, Inc.*, 364 F. App'x 340, 341 (9th Cir. 2010) (affirming district court's dismissal of complaint based on translation attached to complaint because plaintiff's attachment of the translation was a "judicial admission" of its correctness, and "[w]ith no alternative English translation to consider, the court was entitled to rely upon the only English version of the agreement before it"). Raytheon does not here concede the accuracy of Plaintiff's translation. The point is that by the allegations of the complaint and the materials incorporated therein (*i.e.*, the translation of Kuwaiti law in Exhibit C), Mr. Robinson has failed to satisfy the exhaustion requirement that his own complaint necessarily asserts is part of Kuwaiti law.

In the alternative, Mr. Robinson's Kuwaiti law claims could be dismissed for failure to provide a certified translation of the Kuwaiti labor law. *See, e.g.*, *Quiroga v. Fall River Music, Footnote continued on next page*

A case should be preceded by an application to be filed by the labourer or his beneficiaries to the competent labour department which shall summon the dispute parties or their representatives to appear. If the department could not reach an amicable settlement, it shall refer the case, within one month from the case submission date, to the Court of First Instance to decide on it. The referral shall be made by a memorandum comprising a summary of the dispute, pleadings of both parties and comments of the department.

Compl. Ex. C, Art. 146. Article 146 thus sets up a mandatory and specific set of procedures in the applicable "Labour Department" that a petitioner must follow before filing a formal lawsuit. Article 146 also invokes the Labour Department's special expertise in employment matters by requiring that department to prepare a memorandum and comments on the case for the Kuwaiti Court of First Instance to consider. Compl. Ex. C. Art. 146. There is no allegation in the complaint that Mr. Robinson has complied with the administrative exhaustion requirement in Article 146, and Raytheon has no notice of any such Kuwaiti proceedings.

In light of Mr. Robinson's allegation that Kuwaiti law must apply here, *see, e.g.*, Compl. ¶ 3, Kuwait's mandated screening mechanism for resolving labor disputes must also be enforced, requiring the dismissal of Mr. Robinson's complaint. The situation most analogous to this one arises in the context of federal courts applying state law. There, under the *Erie* doctrine, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), federal courts applying state law apply the substantive law of the State in which they sit, or the substantive law dictated by that State's choice of law rules, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In the *Erie* context, it is firmly established that state administrative exhaustion requirements are "substantive" in nature, and that a plaintiff who comes to federal court before exhausting state

_____

*Inc.*, 1998 WL 851574, at *2 n.3 (S.D.N.Y. Dec. 7, 1998) ("Translations of foreign-language documents which are not certified as true and accurate translations and which do not even identify the translator are not properly authenticated and are not admissible evidence. All such translations are therefore disregarded."); *see also Kasper Global Collection & Brokers, Inc. v. Global Cabinets & Furniture Mfrs. Inc.*, 2013 WL 3388427, at *6 n.9 (S.D.N.Y. July 1, 2013) (same). Counts 2 and 4 may be dismissed on this basis alone.

administrative remedies is subject to dismissal. *See, e.g.*, *Feinstein v. Mass. Gen'l Hosp.*, 643 F.2d 880, 885 n.7 (1st Cir. 1981) (citing nearly a dozen cases holding that "the *Erie* doctrine requires a federal court sitting in diversity to apply a state statute requiring referral of a medical malpractice action to a state-created arbitration or hearing tribunal"); *Clarke v. Kentucky Fried Chicken of Cal., Inc.*, 57 F.3d 21, 27 (1st Cir. 1995) (affirming dismissal of Massachusetts state-law sexual harassment claim for failure to exhaust administrative remedies before the Massachusetts Commission Against Discrimination); *White v. Lavigne*, 741 F.2d 229, 230 (8th Cir. 1984) (*per curiam*) ("To waive the exhaustion requirement in the case at bar for plaintiffs suing in diversity would contravene the policies underlying the *Erie* doctrine."); Practice Guide: Federal Civil Procedure Before Trial § 1:253 (William W. Schwarzer *et al.*, eds. 2013) ("Federal courts in diversity actions generally enforce state laws that require prospective plaintiffs, before filing suit, to submit their claim to an administrative tribunal or screening panel").[6]

The explanation for this line of cases is straightforward: even if exhaustion of state administrative remedies could be considered "procedural" in some sense, permitting plaintiffs to circumvent these administrative processes simply by suing in federal court would undermine the central goals of the *Erie* doctrine—the "equitable administration of laws between residents and

---

[6] *See also, e.g.*, *Sandhill Motors, Inc. v. Am. Motors Sales Corp.*, 667 F.2d 1112, 1115 (4th Cir. 1981) (holding that the "failure to exhaust" required state administrative remedies is "fatal in an action begun in federal court"); *Stoner v. Presbyterian Univ. Hosp.*, 609 F.2d 109, 110 (3d Cir. 1979) (*per curiam*) (holding that Pennsylvania's requirement of preliminary arbitration in malpractice cases was a substantive requirement that federal courts sitting in diversity must enforce); *Lockhart v. Coastal Int'l Sec., Inc.*, 905 F. Supp. 2d 105, 115 n.9 (D.D.C. 2012) (explaining that "for Federal courts sitting in diversity," a plaintiff's failure to exhaust state administrative remedies means the "plaintiff has in fact failed to state a claim on which relief may be granted with respect to the unexhausted claim or claims by failing to demonstrate that a necessary precondition to judicial review of those claims has been satisfied") (quotations omitted); *Jones v. Deaconess Billings Clinic*, 2008 WL 5435956, at *4 (D. Mont. July 14, 2008) ("The required exhaustion of the Montana Medical Legal Panel is a substantive provision which under *Erie* this Court is bound to follow."); *Biegacz v. Nutchey*, 1989 WL 134781, at *2 (N.D. Ill. Oct. 13, 1989) ("In a diversity action in federal court, the court will require a plaintiff to exhaust his state administrative remedies if the courts of that state would require exhaustion.").

nonresidents and the discouragement of forum shopping." *White*, 741 F.2d at 230 (citing *Hanna v. Plumer*, 380 U.S. 460, 467 (1965)); *see also Stoner*, 609 F.2d at 110 (explaining that federal courts must enforce state administrative exhaustion requirements because "[t]he fortuity of diverse citizenship should not subject a litigant to legal burdens different from those that a state court would impose").  Moreover, States require exhaustion of administrative remedies for substantive reasons, namely, to "reduce the number of trials" on non-meritorious claims and to make "disposing of meritorious claims" more efficient.  *Stoner*, 609 F.2d at 110.

Mr. Robinson seeks the application of foreign law rather than state law.  But the foregoing principles should operate no differently—and if anything apply with greater force.  By the allegations of the complaint, "Massachusetts Choice of Law[]" rules would require application of "the labor laws of the foreign state," *i.e.*, Kuwait.  Compl. ¶ 3; *see also id.* at ¶ 24 ("Under Massachusetts' Conflict of Law Doctrine, Kuwaiti Law applies.").  Assuming that to be true, Mr. Robinson cannot pick and choose those substantive provisions of Kuwaiti law that he wishes to apply, and so must exhaust remedies under Kuwaiti law.  *See Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4-5 (1975) (*per curiam*) (remanding diversity case for a determination of whether Texas courts would apply Cambodian law, and instructing that "[a] federal court in a diversity case is not free to engraft onto … state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits").

Any contrary approach here would result in the very harms that *Erie* and its progeny seek to avoid.  Such a rule would encourage international forum-shopping in an attempt to avoid Kuwait's administrative exhaustion requirement.  *See White*, 741 F.2d at 230; *Stoner*, 609 F.2d at 110.  It would further result in the inequitable administration of Kuwaiti law, with some

employees who worked in Kuwait being allowed to evade the exhaustion requirement depending on whether they had the ability to file suit outside Kuwait. *See White*, 741 F.2d at 230. And in the particular case of the Kuwaiti law at issue here, it would eliminate the role of the Kuwaiti Labour Departments, which have extensive expertise in interpreting and applying Kuwaiti labor law and which are required under Article 146 to prepare a "memorandum" with "comments" on the case for the applicable Kuwaiti trial court to consider. Compl. Ex. C, Art. 146. Thus, if anything, a federal court failing to enforce an exhaustion requirement in *foreign law* presents even greater cause for concern than in the *Erie* context, because Plaintiff would have a federal court reject another sovereign nation's mechanisms for trying to reach "amicable settlement[s]," concerning a violation of that sovereign's *own laws*. Compl. Ex. C, Art. 146. Basic principles of international comity countenance against such an unnecessary repudiation of Kuwaiti law, which would oddly occur in the process of otherwise attempting to *apply* Kuwaiti law.

That is especially so considering that exhaustion requirements are ubiquitous in American law, and thus Kuwait's exhaustion requirement is entirely consistent with the public policy as expressed in both our nation's state and federal laws. As noted above, States have imposed a variety of exhaustion requirements in connection with different state laws, requirements that federal courts respect under the *Erie* doctrine. *See supra* at 11-13. Many federal laws—including federal employment laws—likewise require plaintiffs to exhaust administrative remedies before proceeding in federal court. *See, e.g.*, 29 U.S.C. § 626(d)(1) (requiring exhaustion of remedies for age discrimination claims); 42 U.S.C. § 2000e-5(f) (requiring exhaustion of remedies for discrimination claims under Title VII); *see also* 8 U.S.C. § 1252(d)(1) (requiring aliens to exhaust administrative remedies in challenging removals); 28 U.S.C. § 2254(b)(1)(A) (requiring federal habeas petitioners to exhaust state habeas remedies).

Put simply, it is entirely appropriate that when a plaintiff claims a violation of foreign law, a federal court would require compliance with that foreign law's exhaustion rules, which serve the important goals of attempting to foster settlements and eliminating non-meritorious claims.

In this regard, the decision in *Martin v. D-Wave Systems Inc.*, 2010 WL 724708 (N.D. Cal. Feb. 26, 2010), is particularly instructive. In *Martin*, the plaintiff filed a claim alleging age discrimination under Canadian law. *Id.* at *1. The defendant responded that such claims must first be brought (and may only be brought) in a Canadian administrative tribunal known as the Human Rights Tribunal. *Id.* To this the plaintiff responded that "the requirement of bringing a discrimination case before the Human Rights Tribunal is merely procedural rather than substantive and therefore does not apply." *Id.* The District Court disagreed with the plaintiff. Citing the First Circuit's *Erie* decision in *Feinstein v. Massachusetts General Hospital*, 643 F.2d 880, 885 n.7 (1st Cir. 1981), noted above, the *Martin* Court held that "[t]he requirement that a claim must be brought before a specified tribunal or other entity is substantive law," a rule that applied no less to foreign law. *Martin*, 2010 WL 724708, at *2. The Court thus "dismiss[ed] plaintiff's age discrimination [claim] for failure to state a claim upon which relief can be granted." *Id.* That is the result that should obtain here. And while *Martin* involved a claim that could apparently only be brought in a Canadian administrative tribunal, its holding necessarily covers the instant situation, where at the very least a claim must *first* be brought in the relevant Kuwait Labour Department.

In short, because Mr. Robinson has failed to allege that he exhausted administrative remedies under Kuwaiti law, Counts 2 and 4 of his complaint must be dismissed.[7]

---

[7] To the extent Mr. Robinson asserts that he is not required to exhaust administrative remedies in Kuwait because his MOU contains a Massachusetts forum selection clause, any such argument should be rejected. Mr. Robinson would be hard-pressed to claim that Raytheon somehow
*Footnote continued on next page*

**B. Even If The Claims Under Kuwaiti Law Could Proceed In Federal Court, Abstention Would Be Appropriate Here.**

Even if Mr. Robinson could avoid Kuwait's administrative exhaustion requirement through his claimed ability to file suit in a U.S. federal court, this Court—informed by principles of international comity—should nonetheless decline to exercise jurisdiction. The Court may alternatively rely upon abstention as a further reason for dismissal, in addition to the other grounds set forth above.

Federal courts have long recognized their ability to "decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2000) (quotations omitted); *see Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994) ("[I]n some private international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction."). In exercising their discretion in this area, courts balance a host of factors that include "the strength of the foreign government['s] interests, and the adequacy of the alternative forum." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004). This prudential abstention is rooted in "[i]nternational comity[,] … a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." *United States v. Nippon Paper Indus. Co, Ltd.*

---

contracted out of the Kuwaiti exhaustion requirement when Mr. Robinson's MOU does not require Raytheon to abide by Kuwaiti labor law in the first place. The MOU in any event certainly does not purport to waive any exhaustion requirement. Nor is it clear that contracting parties would even be allowed, as a matter of Kuwaiti law, to exempt themselves from an otherwise mandatory administrative process. In any event, exhaustion is not inconsistent with the forum selection clause: while the latter may require a party to file a lawsuit in Massachusetts, the point is that such a claim fails to arise *until* the plaintiff has exhausted his remedies in the first place. *See Lockhart*, 905 F. Supp. 2d at 115 n.9 (explaining that a failure to exhaust administrative remedies results in a plaintiff "failing to demonstrate that a necessary precondition to judicial review of those claims has been satisfied").

109 F.3d 1, 8 (1st Cir. 1997). Such abstention is committed to the sound discretion of the district court. *See, e.g.*, *Bigio*, 239 F.3d at 454 ("The decision whether to dismiss a case on international comity grounds ordinarily lies within the discretion of the district court.").

Principles of international comity countenance abstention here. This case concerns work performed in Kuwait that in Plaintiff's view is governed by Kuwaiti law. There can be little question that Kuwait has a strong interest in evaluating the alleged violation of its own labor statutes concerning work performed within its sovereign territory. *See, e.g.*, *Bigio*, 239 F.3d at 454 (concluding that abstention could be proper on remand in a case involving the seizure of property overseas, since the "lawsuit's connection to Egypt [was] . . . undeniably strong"); *GDG Acquisitions LLC v. Government of Belize*, 935 F. Supp. 2d 1348, 1353 (S.D. Fla. 2013) (dismissing foreign contract case on comity grounds because, among other factors, it would require interpretation of Belizean law and "the interests of the Belizean nation far outweigh[ed] the interests of the United States").

In addition, this Court would face significant challenges in attempting to apply Kuwaiti law to the facts alleged here. The official texts of the Kuwaiti labor law and its implementing ministerial decrees are issued only in Arabic. Moreover, as in any legal system, they inevitably draw upon an overall understanding of Kuwait's civil law system, its corpus of statutory and regulatory law, and the history of the Labour Departments' interpretation and administration of the labor law in furtherance of the policy goals of the Government of Kuwait. These considerations suggest that this case should be addressed by the Labour Department and the Kuwait Court of First Instance. *See GDG Acquisitions*, 935 F. Supp. 2d at 1353 (considering, in a comity analysis, that "the Belizean court system likely has a strong interest in seeing that its national laws are properly interpreted"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2008

WL 5958061, at *31 (E.D.N.Y. Sept. 26, 2008) (explaining that international abstention doctrine recognizes that it may be more appropriate for foreign courts to resolve questions of "unsettled foreign law"). There are also potential foreign policy implications associated with applying Kuwaiti labor laws, such as limitations on hours of work per week, *see* Compl. ¶ 27, to American contractors supporting active U.S. military operations in Kuwait. This Court may reasonably determine that the Kuwaiti legal system should more properly pass on questions that require the interpretation of Kuwait's labor statutes and that could also impact Kuwait's diplomatic relations and national security.

Further supporting abstention is the fact that Kuwait has created a system to handle disputes concerning the alleged violation of its labor laws, and there is no allegation here that Kuwait's legal system is somehow inadequate or unavailable. *See, e.g.*, *Ungaro-Benages*, 379 F.3d at 1238 (courts may consider "the adequacy of the alternative forum"); *Diorinou v. Mezitis*, 237 F.3d 133, 139 (2d Cir. 2001) (noting that as part of the comity analysis, "the domestic court considers whether to proceed with litigation properly within its jurisdiction because of the pendency or availability of litigation in a foreign forum"). As discussed above, Article 146 of the labor statute requires the exhaustion of administrative remedies in the "competent labour department," and further provides that, if a settlement cannot be reached, the Labour Department shall refer the case to a Kuwaiti court (the Court of First Instance) with a "memorandum" containing "comments of the department." Compl. Ex. C, Art. 146. From there, the "Court of First Instance shall, within 3 days from the receipt of the application, schedule a session for looking into the case." *Id.* Art. 147.

These provisions reflect a comprehensive dispute resolution process that involves both administrative and judicial components. There is, again, no suggestion here that these processes

18

are inadequate.  And there is good reason to believe that the Kuwaiti legal system—with its greater familiarity of Kuwaiti labor law, that law's history, and the Arabic language—is better equipped to adjudicate this matter.  *See Ungaro-Benages*, 379 F.3d at 1240 (dismissing claim on international comity grounds because plaintiff could pursue relief before a German tribunal, which is "in just as good a position as this court" to consider the issues and "likely to be far more familiar than this court with German law").  Notably, at least one other court has already recognized that, as a general matter, "Kuwait is an adequate alternative forum." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 453 (S.D.N.Y. 2008).

Finally, abstention is warranted because it may well be that Kuwaiti courts have exclusive jurisdiction over claims concerning a violation of Kuwait's labor laws.  Articles 146 and 147 set up a detailed adjudicatory process that makes specific reference to Kuwaiti administrative bodies and courts.  *See* Compl. Ex. C, Art. 146-147.  Those two processes are related, as the relevant Labour Department provides "comments" on the case to the Kuwaiti courts.  *See id.* Art. 146.  Given the interrelated role of an expert administrative department and the otherwise detailed nature of the Kuwaiti legal processes that apply, it is a fair inference that Kuwait intends for its legal system to have exclusive jurisdiction over these kinds of cases. Abstention would avoid the need to resolve these potentially difficult questions in this Court, while allowing Kuwait to consider a claim concerning employment in Kuwait in support of U.S. armed forces but purportedly in violation of Kuwaiti law.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Respectfully Submitted,

Dated:  January 10, 2014                    */s/ James F. Kavanaugh, Jr.*

James P. Gillespie, P.C. (*pro hac vice pending*)    James F. Kavanaugh, Jr.
Daniel A. Bress (*pro hac vice pending*)        Christopher K. Sweeney
KIRKLAND & ELLIS LLP                CONN, KAVANAUGH, ROSENTHAL,
655 Fifteenth Street, N.W.                PEISCH & FORD, LLP
Suite 1200                        Ten Post Office Square
Washington, D.C. 20005                Boston, MA  02109
Tel.: (202) 879-5000                Tel: (617) 482-8200
jgillespie@kirkland.com                jkavanaugh@connkavanaugh.com
dbress@kirkland.com                csweeney@connkavanaugh.com

*Counsel for Raytheon Company and Raytheon Technical Services Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Memorandum of Law in Support of Raytheon's Motion to Dismiss to be served upon all counsel of record registered through the Court's ECF system.

On this 10th day of January, 2014.

*/s/ James F. Kavanaugh, Jr.*

James F. Kavanaugh, Jr.

*Counsel for Raytheon Company and Raytheon Technical Services Company LLC*