UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-cv-12705-RGS

DARRELL J. ROBINSON,
Individually, and On Behalf of
All Others Similarly Situated,

v.

RAYTHEON TECHNICAL SERVICES
COMPANY, L.L.C. and RAYTHEON COMPANY

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

April 28, 2014

STEARNS, D.J.

Darrell J. Robinson is an American citizen who worked as a contract employee for defendants Raytheon Technical Services Company, L.L.C., and its parent corporation, Raytheon Company, on a United States military base in Kuwait.  The case is styled as a class action seeking payment of overtime wages allegedly due Robinson and other similarly situated employees under Kuwaiti labor laws.  Defendants move to dismiss, arguing that Robinson (and the others yet unjoined) worked under a written contract that specified each employee's salary and work hours without regard to Kuwaiti law.  Moreover, defendants assert that even if Kuwaiti law applies, Robinson has failed to exhaust the pre-suit administrative

remedies required by the very Kuwaiti statute that Robinson seeks to invoke.

## BACKGROUND

Robinson lives in Columbus, Georgia.  Raytheon Company is a U.S. corporation headquartered in Waltham, Massachusetts.  Raytheon Company is the parent company of Raytheon Technical Services Company LLC (collectively Raytheon).  Raytheon provides technical and professional services to government and commercial customers worldwide.

In May of 2008, Robinson began work as a Functional Analyst for Raytheon at Camp Buehring in northwestern Kuwait near the border with Iraq.  In February of 2010, Robinson was promoted to Operations Manager, a position that he held until July of 2013.  On May 10, 2011, during his employment at Camp Buehring, Robinson signed an Amended Offer letter (Offer Letter).[1]  Under the terms of the Offer Letter, Robinson was to be paid $3,531.20 bi-weekly based on a standard forty-hour work week, and an additional $6,356.16 bi-weekly based on a seventy-two hour, seven-day work week.  The Offer Letter stated that Robinson would be "required to work a standard seventy-two (72) hour/seven (7) day work week and will

---

[1]  Robinson attached Raytheon's "Amended Offer" dated May 6, 2011, to his Complaint as the functional "employment agreement" in this case. *See* Compl. ¶ 19 and Ex. A.

receive straight-time pay as well as expatriate benefits on all hours worked over forty (40) while on this assignment." Compl. - Ex. A at 1. The Offer Letter also guaranteed a "hardship premium," along with other benefits such as a "cost-of-living allowance," "home-leave allowance," "lodging," and "transportation." *Id.* at 1-2. The offer was conditioned on Robinson's verification of his citizenship and eligibility to work in the United States, and the obtaining of a security clearance and medical approval. *Id.* at 2.

Because of the foreign nature of Robinson's assignment, attached to the Offer Letter was a Memorandum of Understanding (MOU), containing additional terms and conditions of employment. The MOU iterated that Robinson's "standard work hours will be 72 hours per week, 7 days per week while [he] was in the host location and 40 hours per week when [he is] on PTO or working outside the host location." Compl. – Ex. B at 4. The MOU further stated that Robinson would

> observe local working hours and public holidays and [would] continue to accrue paid time off in accordance with Company policy. *Should a local holiday be observed, it should be considered a substitute for a home country holiday. You will not be paid for any holidays taken in excess of the total of number of US holidays observed by the Company based on your benefit code. You will be responsible for using the US timekeeping system to report your standard work hours.*

*Id.* at 3 (emphasis added). Robinson's assignment was deemed "temporary," and that the Offer Letter and the MOU constituted his "entire agreement

3

with [Raytheon] regarding [his] employment." *Id.* at 1.  The "Governing Law/Venue" provision of the MOU stated that

> [t]he courts within the Commonwealth of Massachusetts in the United States, whether state or federal, shall have exclusive jurisdiction over disputes concerning this Agreement or its interpretation except for that body of law pertaining to conflict of law, regardless of the physical location of the parties at the time the Agreement is signed.  Any legal action which is in any way connected with this Agreement by the Company must be instituted in such courts.  By signing this Agreement, you consent and submit to jurisdiction there.

*Id.* at 11.  Robinson signed the agreement and worked for Raytheon in Kuwait until June of 2013.

Robinson filed this action on October 24, 2013, asserting putative class claims for breach of contract (Count I), violations of Kuwaiti labor laws (Count II), and identical individual breach of contract (Count III) and Kuwaiti labor law claims (Count IV). [2]  Robinson identifies the Offer Letter

---

[2]  Robinson defines the class as all current and former Raytheon employees who worked in Kuwait from May 2008 until July 2013, and were not paid 125 percent of their normal hourly wages for all hours worked in a week in excess of forty eight; were not paid 125 percent of their normal hourly wages for all hours worked in a week in excess of thirty-six during the month of Ramadan; were not paid double remuneration and/or given an additional day off when working during the thirteen official Kuwaiti holidays; were not paid end of service benefits; and/or were not given at least thirty days annual leave per year.  Compl. ¶ 46.

and the MOU as the operative contractual agreements.[3]  Raytheon moves to dismiss the Complaint, asserting that it fails to allege a violation of any contractual provision and, moreover, that the MOU does not incorporate Kuwaiti law into the parties' agreement.  The parties' briefing of the motion to dismiss was completed on March 24, 2014.

## DISCUSSION

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Two basic principles guide the court's analysis.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 679.  A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  "If the factual allegations in the complaint are too meager, vague, or

---

[3]  Robinson alleges that "all similarly situated employees working for the defendants in Kuwait had similar agreements and MOU's governing their compensation and choice of venue with defendants, different only in minor ways, such as in the named supervisor and the rate of pay."  Compl. ¶ 26.

conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010).[4]

*Count I and Count III – Class and Individual Claims for Breach of Contract*

Robinson asserts that Raytheon breached its "contract with [him] and [other] similarly situated employees by refusing to obey Kuwaiti law." Compl. ¶ 58.   According to Robinson, under Kuwaiti law, overtime is defined as "working more than forty-eight (48) hours in a week, and provides that an employee shall have the '. . . right to obtain a wage against the overtime hours in a rate which is more than his ordinary rate in a similar period by 25%.'"   Compl. ¶ 27.   Kuwaiti law also reduces the allowable number of working hours to thirty-six (36) hours per week during Ramadan.[5]  Robinson contends that notwithstanding the terms of the Offer

---

[4]  The court may also look to documents the authenticity of which are not disputed by the parties, to documents central to the plaintiff's claim, and to documents referenced in the complaint. *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).  Here, Robinson has attached to the Complaint a disputed translation of portions of what purports to a Kuwaiti labor law statute.

[5] The annual observance of Ramadan is regarded as one of the Five Pillars of Islam and fasting is obligatory from sunrise to sunset.  The ninth month of the Islamic lunar calendar, Ramadan typically lasts 30 days. *See* http://islam.about.com/od/ramadan/tp/ramadan-hub.htm (last accessed Apr. 24, 2014).

Letter and MOU, as employees based in Kuwait, Raytheon was obligated to pay him and other class members at a rate of 125 percent of their regular hourly rate for overtime hours worked in a week that exceeded forty-eight (48) hours; and for overtime hours worked in a week that exceeded thirty-six (36) hours during the month of Ramadan.[6]

While Robinson concedes that the Offer Letter and MOU define the parties' contractual relationship, he argues that the Federal Acquisition Regulation (FAR), "requires" Raytheon "to adhere to Kuwaiti labor laws," and that he is a "third-party beneficiar[y] of [that] contractual commitment . . . ." Compl. ¶¶ 58, 67; Dkt. #18 at 4. The FAR sets out rules governing the "acquisition process" through which the government purchases goods and services. *See* 48 C.F.R. §§ 1 *et seq.* (2001). The FAR is issued and maintained largely under the authority of the Secretary of Defense pursuant to the Federal Procurement Policy Act of 1974, and it broadly outlines procurement policies and procedures with the goal of "obtain[ing] maximum efficiency in the expenditure of public resources." *Wood v. United States*, 290 F.3d 29, 34 (1st Cir. 2002). The primary

---

[6] Robinson also claims that Kuwaiti law obligated Raytheon to pay him double his hourly salary during the thirteen official Kuwaiti holidays (if Raytheon failed to compensate him with an alternate day off), and a day's wages for each day of required annual leave Raytheon failed to provide to him. Compl. ¶ 73.

purpose of the FAR is to "deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives."  48 C.F.R. § 1.102.

"Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories, . . .  a person aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him." *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994).  It is not enough for a plaintiff to show that he might incidentally benefit from another's contract. *Spinner v. Nutt*, 417 Mass. 549, 555 (1994) (plaintiffs were merely incidental beneficiaries of the contract between the trustees and their attorneys); *see also Anderson v. Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 367 (1997) (lessee assumed no contractual responsibilities expressly benefitting employees on the premises); *Macksey v. Egan*, 36 Mass. App. Ct. 463, 469 (1994) (shareholder was only an incidental beneficiary of a corporate reorganization tender offer).

The contention by Robinson that he was an intended beneficiary of the FAR fails as a matter of law as the FAR, to the extent that it creates a contractual relationship between a contractor and the federal government, does not purport to confer a private right of action on the contractor's

employees.  Nor in the absence of authorization language by Congress will a court infer an implied right of private action, particularly one based on a non-statutory regulatory violation.  *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.").  *Cf. Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) ("[W]e are mindful that we must give 'narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.'").  The district court cases to be presented the issue are in accord that the FAR does not give rise to a private right of action.  *See Marini v. DragadosUSA, Inc.*, 2012 WL 4023674, at *1 (D. Mass. Sept. 11, 2012), citing *C & H Contracting of MS, LLC v. Lakeshore Eng'g Servs.*, 2007 WL 2461017, at *2 (S.D. Miss. Aug. 24, 2007); *see also Ciliv v. UXB Int'l, Inc.*, 2012 WL 5245323, at *4 (W.D. Va. Oct. 22, 2012) ("It is clear that a breach of the Federal Acquisition Regulations, standing alone, cannot give rise to a private right of action. Plaintiff has pointed to no statutory language that authorizes, explicitly or implicitly, a private right of action.").  Absent Congressional authorization of a private right of action or language in the Offer Letter or the MOU specifying Robinson as an intended

beneficiary of the FAR obligations assumed by Raytheon to the federal government (none is alleged), the contract claims, based as they are on a third-party beneficiary theory, necessarily fail.  Nor is there any allegation that Raytheon failed to fully abide by the terms of the Offer Letter and the MOU.  Consequently, Counts I and III of the Complaint will be dismissed with prejudice.

*Count II and IV – Class and Individual Claims for Violations of Kuwaiti Law*

In Counts II and IV of the Complaint, Robinson asserts that, under Massachusetts choice of law principles, Raytheon was obligated to comply with Kuwaiti labor laws notwithstanding the terms of his employment contract.[7]  The initial and fatal aspect of the assertion is that Robinson

---

[7]  Where, as here, the parties' agreement has no choice of law provision, a federal court applies the choice-of-law framework of the designated forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 491 (1941).  Massachusetts utilizes the "functional" approach of Restatement (Second) of Conflict of Laws.  *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 5 (1st Cir. 2004), quoting *Bushkin Assocs. v. Raytheon Co.*, 393 Mass. 622, 631 (1985).

> The principles contained in § 186 and § 187 provide that, in the absence of a choice of law by the parties, their rights "are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."  *Id.* at § 188(1).  "[T]he contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of

offers no competent evidence of what that law is. Attached to Robinson's

Complaint is an uncertified English language document that purports to be

the "State of Kuwait – New Private Sector Labour Law No. 6 of 2010,"

together with an uncertified copy of what the court presumes is a version of

the same document in Arabic. Under Fed. R. Evid. 902(3), a foreign public

document offered in a U.S. court must be attested to by a person authorized

by a foreign country's laws and be accompanied by a final certification by a

U.S. diplomatic person attesting to the genuineness of that person's

signature and his or her official position. Failure to comply with the Rule

902(3) renders the document inadmissible. *See, e.g., Geshke v. Crocs, Inc.*,

740 F.3d 74, 79 (1st Cir. 2014) (noting the appellant's failure to

---

negotiation of the contract, (c) the place of performance, (d) the
location of the subject matter of the contract, and (e) the
domicile, residence, nationality, place of incorporation and
place of business of the parties." *Id.* at § 188(2). Factors under
§ 6 that are said to be relevant to the choice of the applicable
rule of law include: "(a) the needs of the interstate and
international systems, (b) the relevant policies of the forum, (c)
the relevant policies of other interested states and the relative
interests of those states in the determination of the particular
issue, (d) the protection of justified expectations, (e) the basic
policies underlying the particular field of law, (f) certainty,
predictability and uniformity of result, and (g) ease in the
determination and application of the law to be applied." *Id.* at §
6(2).

*Id.*

authenticate a translated report as required under Fed. R. Evid. 902(3));

*United States v. De Jongh*, 937 F.2d 1, 4 (1st Cir. 1991) ("Where a rule

prescribes specific conditions for authenticating a public document, and the

document's proponent fails to comply with the specified conditions, the

proffer should ordinarily be rejected."); *United States v. Perlmuter*, 693

F.2d 1290, 1293 (9th Cir. 1982) ("[T]he requirements of 902(3) for self-

authentication of foreign public documents were not met. . . . Thus, the trial

court abused its discretion by admitting the unauthenticated documents

into evidence.").

Why this Rule of Evidence is not an empty formality is amply

illustrated by the parties' dispute over what Kuwaiti law actually requires.

According to the uncertified English language version submitted by

Robinson, Article 146 of the Kuwaiti law provides, among other parts, that:

> [a] case *should* be preceded by an application to be filed by the
> labourer or his beneficiaries to the competent labor department
> which shall summon the dispute parties or their representatives
> to appear.   If the department could not reach an amicable
> settlement, it shall refer the case, within one month from the
> case submission date, to the Court of First Instance to decide on
> it.   The referral shall be made by a memorandum comprising a
> summary of the dispute, pleadings of both parties and
> comments of the department.

Compl. Ex. C at 43 (emphasis added). Seizing on this language, Raytheon

argues that sauce for the goose is sauce for the gander and that if Robinson

wants the cure of Kuwaiti law, he must first take its medicine and exhaust his administrative remedies with the Kuwaiti Department of Labor.[8]  Not so replies, Robinson: the telltale *should* in the statute makes the pre-litigation grievance procedure optional.  'Tis so, counters Raytheon, supplying the court with the affidavit of Ahmed Barakat, the managing partner and head of litigation for Al Ruwayeh & Partners, a Kuwaiti law firm that practices employment law.  Barakat attests that "Article 146 is a mandatory pre-requisite to pursuing a claim in any judicial form," and that "[i]n Arabic, the text itself conveys that the requirement is mandatory." Barakat Decl. ¶¶ 2-3.[9]  Putting aside the merits of the dueling translations,

---

[8]     Under the *Erie* doctrine, "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law."  *In re Exxon Valdez,* 484 F.3d 1098, 1100 (9th Cir. 2007), quoting *Freund v. Nycomed Amersham,* 347 F.3d 752, 761 (9th Cir. 2003).  The requirement that a claim must be brought before a specified tribunal or local department is substantive law.  *See Feinstein v. Mass. Gen. Hosp.,* 643 F.2d 880, 885 n.7 (1st Cir. 1981) ("[E]very court that has considered the question has concluded that the *Erie* doctrine requires a federal court sitting in diversity to apply a state statute requiring referral of a medical malpractice action to a state-created arbitration panel or hearing tribunal."); *see also Begay v. Kerr-McGee Corp.,* 682 F.2d 1311, 1317 (9th Cir. 1982), quoting *Feinstein,* 643 F.2d at 888, and agreeing that "by reason of the policies expressed in *Erie,* a federal court requires that a state's rule barring an action from proceeding in its courts must be applied to bar the action from the federal court.").

[9]   Barakat further explains that

because Robinson has failed to carry his initial burden of showing what Kuwaiti labor law in fact requires, Counts III and IV of the Complaint will be dismissed as well.  *See Abdille v. Ashcroft*, 242 F.3d 477, 489 n.10 (3d Cir. 2001) ("In general, foreign law is treated as a fact that must be proven by the parties."), citing *Black Diamond Steamship Corp. v. Robert Stewart & Sons*, 336 U.S. 386, 397 (1949) ("[T]he Court has adhered to the general principle that foreign law is to be proved as a fact.").

While the court will dismiss Counts II and IV without prejudice, a few observations by way of instruction to the parties may be in order.  If the case were in a factually dispositive posture, *see Abdille, supra,* the court would be inclined to find that under conflict of law principles, *see* n.7, *supra*, Massachusetts would find that Kuwait has the far greater interest in interpreting and enforcing its own labor laws, especially given the fractious

---

> [i]f the parties are unable to reach a settlement in the administrative process, Article 146 requires the Labour Department to refer the matter to the Court of First Instance no later than one month after filing the administrative claim. Under Article 147, the Court of First Instance has three days from the referral to schedule an initial hearing with the parties. The law does not provide an alternative mechanism by which individuals may bypass the administrative process and initiate litigation directly in the Court of First Instance.  Administrative exhaustion is thus mandatory, not optional.

*Id.* ¶ 3.

atmosphere in which this dispute arises and the potential implications for delicate issues of Kuwaiti sovereignty and U.S.-Kuwaiti relations. *See* http://www.stripes.com/news/us-linguists-could-face-jail-over-contractor-disagreement-1.225972 (last visited April 26, 2014). While this is not a case in which the international abstention doctrine would apply (because neither party has brought a parallel proceeding in the Kuwaiti courts), it is a case in which the court might well consider entering a stay while plaintiff pursues his remedies in the Kuwaiti courts.[10] "International comity is a doctrine that counsels voluntary forbearance when a sovereign, which has a legitimate claim to jurisdiction, concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." *United States v. Nippon Paper Indus. Co., Ltd.*, 109 F.3d 1, 8 (1st Cir. 1997). This has special force in a case like this where Raytheon has concededly kept its end of the contractual bargain while Robinson, by all appearances, is seeking to exploit Raytheon's failure to specify a choice of law in the parties' employment contract to extract more than what he willingly agreed

---

[10] Courts applying abstention in deference to parallel foreign proceedings have relied on the *Colorado River* abstention factors, *see Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 685 (7th Cir. 1987), or principles of international comity, *see Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994).

to take when he signed on to the agreement. Consequently, Counts II and IV will be dismissed without prejudice.[11]

## ORDER

For the foregoing reasons, defendants' motion to dismiss the Complaint is <u>ALLOWED</u>.  The Clerk will enter an order of dismissal noting that Counts I and II are dismissed with prejudice, while Counts III and IV are dismissed without prejudice.   The Clerk may then close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[11] "The decision whether to dismiss a case on international comity grounds ordinarily lies within the discretion of the district court." *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2000).